2011 Ark. App. 668

**Fan TIMPANI, Appellant**

v.

**LAKESIDE SCHOOL DISTRICT, Appellee.**

**No. CA 11–78.**

Court of Appeals of Arkansas.

Nov. 2, 2011.

Adam Heath Butler, North Little Rock, for appellant.

Walter Paul Blume, Little Rock, for appellee.

CLIFF HOOFMAN, Judge.

This is an appeal involving the Teacher Fair Dismissal Act of 1983. *See* Ark.Code Ann. §§ 6–17–1501 to 6–17–1510 (Repl. 2007 & Supp.2011). Appellant Fan Timpani appealed her dismissal by appellee Lakeside School District to the Garland County Circuit Court. After the circuit court affirmed her dismissal, she brought this appeal. We affirm.

Appellant, who was an employee of the school district for more than twenty years, taught sixth grade at its middle school. In November 2007, appellant used "bonus points" to order two twenty-seven-inch televisions, a DVD player, and a microwave oven from the Scholastic Book Club. The book club awarded bonus points based on several factors, including the dollar amount spent on each order, for which appellant used school funds, money from students and other teachers, and her personal money. The account through which appellant placed these orders and redeemed the bonus points was held in her name. The middle school's principal, Jamie Preston, learned of this order on December 4, 2007, when the DVD player was delivered to the school. Ms. Preston called the school district's administrative office to ask the superintendent, Shawn Cook, for advice about how to handle the matter. Superintendent Cook told Ms. Preston to ask appellant what the instructional purpose was for the items she had ordered. Appellant informed Ms. Preston that they were for her personal use because she had obtained them with her personal bonus points. When Ms. Preston explained that, because the bonus points were acquired with money from students and the school district, appellant could not keep the items for her personal use, appellant restated her belief that the bonus points belonged to her, for her own personal use, and refused to cancel the order. Ms. Preston then told appellant that Superintendent Cook had advised her that the bonus points were not for appellant's personal use. According to Ms. Preston, appellant replied, "He is full of crap." Appellant also told Mrs. Timmons, another teacher who was nearby during this exchange, that "this school sucks."

Ms. Preston gave the following statement about the incident to Superintendent Cook:

On the morning of December 4, 2007, I was made aware of a DVD player that had been delivered to Mrs. Fan Timpani on December 3, 2007 as well as a confirmation of a fax for two 27 inch television sets, the DVD player, and a microwave. These items were purchased with bonus points from Scholastic book orders. A copy of the fax is attached.

At that point, I called Mr. Scoggins, assistant superintendent at Lakeside School District and asked him to advise me on how to handle this situation. Shortly, Mr. Cook, Superintendent of Lakeside School District, called and questioned me about this situation. He then told me to ask the teacher what the instructional purpose or the purpose for the students at Lakeside Schools was.

Mr. Pierce, Assistant Principal at L.M.S. and I then took the DVD player to the teacher's hallway. There was a student in her room and a parent in her neighbor's room. When I approached Mrs. Timpani, she said, "Oh. You brought my stuff down." At this point, I asked her the questions Mr. Cook had directed me to ask. Mrs. Timpani stated that she did not intend to use the items at school; they were her personal items that she had bought with her personal bonus points. I tried to explain to her that the bonus points were acquired by ordering books with money from students, district money, and possibly state money (if she used her money from Literacy Lab to purchase books and acquire bonus points).

I told Mrs. Timpani she could cancel the order. She said no. I told her she could return it to Scholastic, she said she "was unable to box them up and return them due to her arm. . . ." I told her she could inventory the DVD and use it in her classroom. However, Mrs. Timpani kept stating that the bonus points were hers—personally and that

nobody had ever told her she couldn't use her points any way she chose.

Upon seeing that the conversation was not being settled, I stated to the teacher that Mr. Cook had already said that the bonus points were not hers personally and that the items ordered could not be used for her personally. To this, Mrs. Timpani stated "He is full of crap." I told Mrs. Timpani that I would be glad to "call Mr. Cook and let him know that she believed his directive to be 'full of crap.'" The conversation ended with her asking another teacher, Mrs. Timmons, if she had ever been told about this. Mrs. Timmons stated, "I don't know. I don't do book orders." At that, Mrs. Timpani walked into Mrs. Timmons' room and told me to "forget it and keep the stuff."

Mrs. Timmons also provided a statement to Superintendent Cook, in which she stated:

On the day in question, I was in my classroom, room 418, at my computer when I heard voices in the hall. I recognized Mrs. Timpani's voice but it did not register who she was talking to. The tone of voice wasn't yelling, it was just that it was taking place directly outside of my door.

Upon entering the hallway, Mrs. Timpani was to my right and Mrs. Preston was to my left, holding a box. It was obvious that they were having a difference of opinion, but I didn't know what the subject matter was. Mrs. Preston was saying to Mrs. Timpani, "You can't do that." "It's illegal." "It isn't your money to spend." And other phrases of that nature. Mrs. Timpani was responding that she didn't know, she had never been told that, etc. She then turned to me and asked if I remembered ever being told that we couldn't use bonus points from book orders to buy

things for ourselves and I replied that I wouldn't remember if we had because I don't do book orders.

Mrs. Preston told Mrs. Timpani that Mr. Cook told her specifically that is [sic] was illegal and the things would have to be sent back. Mrs. Timpani then replied, "Well, he's full of crap." "I'm not packing anything up and sending it anywhere with one arm." Near the end of the conversation, Mrs. Timpani turned toward me (I was between her and the other hallway) and said, "This school sucks."

In January 2008, appellant and her counsel met with Ms. Preston and the superintendent in his office so that appellant could give her side of the story. Although appellant admitted having placed the order, she disputed Ms. Preston's version of what had happened and indicated that Ms. Preston had not told the truth. When Superintendent Cook told appellant that she should thank Ms. Preston for trying to help appellant with this, she said: "Thank you, Jamie," in what Ms. Preston and the superintendent believed was a sarcastic and disrespectful manner.

Several days later, Superintendent Cook sent the following letter advising appellant that he was going to recommend that the school board terminate her employment:

You are hereby notified that you are suspended with pay, effective immediately, and that I intend to recommend that your contract with the Lakeside School District be terminated. The reasons for this recommendation are as follows:

1. You ordered two twenty-seven inch screen televisions, DVD player, and a microwave oven using resources obtained from school district money for personal gain. You told me you planned on giving them to your children for presents.

2. When Mrs. Preston told you that the items you ordered could not be for your personal use and were to be used for instruction, you then argued with her. When Mrs. Preston again told you that you could not use these funds for personal items, you replied to her, saying, "Mr. Cook is full of crap!" When you were walking away from Mrs. Preston, you said "This school sucks!" Your comments to Mrs. Preston were made in a loud voice and in the presence of others.

3. You misrepresented what was said the day in which the above occurred. You told the principal she was not telling the truth. You said you never said the Superintendent was full of crap and you never said this school sucks! You told Ms. Preston you thought you could trust her to tell the truth. You made these statements in my presence during the investigation. After interviewing witnesses I am confident you committed perjury during the investigation.

4. In a meeting in my office on January 11, 2008, Ms. Preston and I gave you considerable opportunities to be forthright and forthcoming about the purchase of merchandise through Scholastic Books. Instead, you were rude, argumentative and, once again, disrespectful toward Ms. Preston and me. For example, when I told you that Ms. Preston was trying to help you and that you should thank her for what she was trying to do for you in this circumstance, you told her "Thank You!" in a very loud and sarcastic manner. Based on your behavior in the meeting ... I concluded that you are not interested in working with Ms. Preston and that you still believe ·that

ordering merchandise for personal use from book purchases made with District funds and student funds is not improper.

Appellant asked for a hearing before the school board. At the hearing on March 17, 2008, Superintendent Cook, Ms. Preston, appellant, and appellant's husband, Pat Timpani, testified. Superintendent Cook stated that, at the interview with appellant, he had hoped she would offer a reasonable explanation for her behavior, but she did not give one. He said that he did not consider bonus points to be for the teachers' personal use because they were derived from student funds, teachers' money, and instructional money provided by the school district. He stated that to his knowledge, no teacher had ever been authorized to use bonus points for his or her own personal use. He also said that appellant was very disrespectful, sarcastic, and untruthful during the interview and that appellant accused Ms. Preston of lying about the incident. He stated that Mrs. Timmons's statement had supported Ms. Preston's; he explained that, although he would not have recommended termination solely because of appellant's remarks that "he was full of crap" and that "the school sucked," he thought it was inappropriate for her to make those remarks aloud in a school building, during school hours, when children were present. He also said that appellant had misrepresented the incident when she told him during the interview that she had never made those statements; that she did not know where "all this was coming from"; and that Ms. Preston was lying. He stated that he had investigated the matter and determined that appellant was untruthful, even though he had given her considerable opportunity to be forthright. He added that, if appellant had been forthright and had given him a reasonable explanation, he would have considered not terminating her; instead, she was "rude, argumentative and untruthful."

Superintendent Cook testified that he believed that appellant had violated Section 3.19 of the school's Personnel Policy Manual, which provided that "[s]upplies and materials purchased with school funds, or for which the teacher is reimbursed with school funds, are school property, and should remain on school property." He also stated that she had violated Section 3.41, which prohibited the teachers from using their professional relationship with students for private advantage. He added that he believed that she had also violated Arkansas Code Annotated sections 6–21–410 and 6–24–112 (Repl.2007). Section 6–24–112 prohibits district employees from accepting a gratuity in connection with a public educational entity's transaction. Section 6–21–410 makes it illegal for a teacher to have any interest in the profits, proceeds, or sale of any instructional materials unless she is the author. He explained that when he used the word "perjury" in his notice to appellant, he did not mean to accuse her of a crime but simply meant that she had made untrue statements. Superintendent Cook stated that when he met with appellant, he made her aware of the laws and policies on which he relied, except for one, which he later added.

Ms. Preston testified that she believed that appellant's behavior was unethical and that, since the incident, she had spoken with her staff about the use of bonus points; their general reaction was one of "shock—like, 'Of course, we knew that.' I have not determined that anyone else used bonus points for personal gain." She explained that she knew that, toward the end of her conversation with appellant on December 4, appellant was upset. She added, "I knew that in the past it was very easy for something like that to upset her

and cause her to become confrontational even though it shouldn't." She said that when appellant said "Thank you" to her in Superintendent Cook's office, she did so in a loud and sarcastic manner. She also stated that, in that meeting with the superintendent, appellant told him that Ms. Preston's statements were untrue; denied having said that he was "full of crap" or that "the school sucked"; and described her prior statements as "she didn't care what Mr. Cook said." Ms. Preston believed that appellant was untruthful.

Appellant testified that she had believed that the bonus points were for her personal use and that they reflected the amount of her own personal expenditures with the book club over the years. She presented bank records demonstrating that she had spent $1,343.18 of her own money with the book club. She explained that, in the past, she had also purchased two cameras (one for her daughter) with her bonus points, which she did not add to the school's inventory. She did not believe that she had done anything unethical because she had never received any written instructions stating that it was against the rules to use the bonus points for herself. She admitted that she had not asked for permission to do so. At first, she said that she did not remember whether she had said that Superintendent Cook was "full of crap" or that "Lakeside sucks," but later admitted that she "probably did" make those statements because Ms. Preston had her "that upset." She added, "Ms. Preston knows how to push my buttons." She denied being disrespectful at the meeting in Superintendent Cook's office. She admitted, however, that when he suggested that she should thank Ms. Preston, she did so; she added, "I said it sarcastically, but not loud. I didn't see any point to be thanking someone when I am being told I am going to lose my job and that I was breaking the law and cheating."

Pat Timpani testified that he had been a teacher at Lakeside Middle School for fourteen years, and during that time, had received no guidance about the use of the bonus points. He stated that he was present at the December 2007 meeting with Ms. Preston about book-club orders; after the meeting, he spoke with seven teachers, two or three of whom indicated that they had also used bonus points for themselves. He also stated that he was sitting outside the office during appellant's meeting with the superintendent and Ms. Preston and heard appellant call Ms. Preston "a liar."

After the hearing, the school board unanimously found that the four reasons on which Superintendent Cook had based his recommendation that appellant be terminated were true. Appellant appealed the school board's decision to circuit court, pursuant to the Arkansas Teacher Fair Dismissal Act. Ark.Code Ann. § 6–17–1510 (Repl.2007).

The Garland County Circuit Court held a hearing on October 30, 2010, where appellant explained her accusation that Ms. Preston was untruthful:

> I was referring to when Mr. Cook asked Ms. Preston if she had any eye-witnesses and she said that the vice-principal was standing right behind her and heard the whole thing. I said he was not there. I would have been looking face-to-face with him if he was there. I said he came to the door of my teacher mate but he went on and never came back.... I was not saying Ms. Preston was lying because she said I told her that the superintendent was full of crap. I don't remember saying that at the conference, and I just don't recall saying it.

However, she admitted that she might have said "something," because she was "upset about the accusations that were

made toward me and I just don't remember."

Appellant's husband also testified at this hearing. He stated that Cathy Sutton and Sandy Parker were two of the other teachers with whom he had talked about the bonus points after the staff meeting with Ms. Preston. Sandra Parker testified that she had retired from Lakeside School District in the spring of 2008; that she had used the book club program; that the school had no written policy about it; that she understood it was appropriate for teachers to use their bonus points any way they wished; and that she had used her bonus points for books for her classroom and for other things, such as desk calendars, for herself. Catherine Sutton testified that it was her understanding that the teachers owned the bonus points. She stated that she had occasionally ordered items for her personal use, such as a toaster oven and three small refrigerators; she used two of the small refrigerators at school and took the toaster oven and one refrigerator home. She added: "I was told by administration at Lakeside School District to take one of the refrigerators I ordered home because we had an energy audit."

In closing, appellant's counsel argued that the school board's counsel, Paul Blume, had incorrectly advised the school board at the hearing when he informed the board that there was "no such thing as probation. The school board does not have the ability to place probation upon an employee." Appellant's counsel noted that Arkansas Code Annotated section 6–17–1510(b) states that, upon completion of the hearing, the board shall either uphold the recommendation of the superintendent to terminate, or reject or modify the superintendent's recommendation, or continue the contract under "such restrictions, limitations, or assurances" as the board deems to be in the school district's best interest. He argued that Mr. Blume's advice about

there being no such thing as probation misrepresented all of the options available to the board; therefore, they could not properly exercise their discretion. Otherwise, he stated, the board "might have decided it was a bad day for Ms. Timpani but she was a good teacher and we should just put some restrictions on her." Appellant's counsel also argued that she was not adequately notified of the reasons that the superintendent was recommending termination because she was not given copies of the sections of the policy manual or the statutes on which the superintendent relied.

The trial court sent a letter to counsel ruling that the board did not abuse its discretion in terminating appellant's contract. Appellant's counsel requested specific findings of fact and conclusions of law. In its subsequent order, the circuit court found that appellant had failed to demonstrate that the school board had abused its discretion in effecting her dismissal; that the basis for her dismissal constituted "just and reasonable cause," as required by Arkansas Code Annotated section 6–17–1507(a) (Repl.2007); and that her termination must be upheld. Appellant then pursued this appeal.

Our standard of review in matters involving the Teacher Fair Dismissal Act is limited to whether the circuit court's decision was clearly erroneous. *Russell v. Watson Chapel Sch. Dist.*, 2009 Ark. 79, 313 S.W.3d 1; *Fayetteville Pub. Schs. v. Dial*, 2010 Ark. App. 296, 2010 WL 1379801. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court from the entire evidence is left with a firm conviction that an error has been committed. *Id.* Facts in dispute and determinations of credibility are within the province of the fact-finder. *Russell, supra.*

The Teacher Fair Dismissal Act provides that a teacher's termination by a school district shall be void unless the school district substantially complies with the provisions of the Act.[1] Arkansas Code Annotated section 6–17–1503 (Repl.2007) provides:

(a) The General Assembly finds:

(1) That the current standard, which requires cause that is not arbitrary, capricious, or discriminatory, for the nonrenewal, termination, or suspension of a teacher should be raised to a standard of just and reasonable cause; and

(2) That the current standard for compliance with this subchapter and a school district's personnel policies of strict compliance should be lowered to substantial compliance.

(b) This subchapter is not a teacher tenure law in that it does not confer lifetime appointment of teachers.

(c) A nonrenewal, termination, suspension, or other disciplinary action by a school district shall be void unless the school district substantially complies with all provisions of this subchapter and the school district's applicable personnel policies.

Arkansas Code Annotated section 6–17–1507 (Repl.2007)[2] provides:

(a) A teacher may be terminated only during the term of any contract when there is a reduction in force created by districtwide reduction in certified staff or for incompetent performance, conduct which materially interferes with the continued performance of the teacher's duties, repeated or material neglect of duty, or other just and reasonable cause.

(b) The superintendent shall notify the teacher of the termination recommendation.

(c)(1) The notice shall include a statement of the grounds for the recommendation of termination, setting forth the grounds in separately numbered paragraphs so that a reasonable teacher can prepare a defense.

(2) The notice shall be delivered in person to the teacher or sent by registered or certified mail to the teacher at the teacher's residence address as reflected in the teacher's personnel file.

Under the Teacher Fair Dismissal Act, the exclusive remedy for a teacher with three successive years of service in the school district, who is aggrieved by a decision made by the board, is an appeal to the circuit court in the county in which the school district is located. Additional testimony and evidence can be introduced to show facts and circumstances showing that the termination or nonrenewal was lawful or unlawful. Arkansas Code Annotated section 6–17–1510(b) (Repl.2007)[3] provides:

(b) Any licensed teacher who has been employed continuously by the school district three (3) or more years or who may have achieved nonprobationary status pursuant to § 6–17–1502 may only be terminated or the board of directors may refuse to renew the contract of the teacher when there is a reduction in force created by districtwide reduction in certified staff, for incompetent performance, conduct which materially interferes with the continued performance of the teacher's duties, repeated or material neglect of duty, or other just and reasonable cause. Upon completion of

1. In Act 1739 of 2001, the General Assembly amended the standard from strict compliance to substantial compliance, which was the standard prior to Act 625 of 1989.

2. This statute was amended in 2011.

3. This statute was also amended in 2011.

the hearing, the board of directors, within ten (10) days after the holding of the hearing, shall:

(1) Uphold the recommendation of the superintendent to terminate or not renew the teacher's contract;

(2) Reject or modify the superintendent's recommendation to terminate or not renew the teacher's contract; or

(3) Vote to continue the contract of the teacher under such restrictions, limitations, or assurances as the board of directors may deem to be in the best interest of the school district. The decision shall be reached by the board of directors within ten (10) days from the date of the hearing, and a copy shall be furnished in writing to the teacher involved, either by personally delivering it to the teacher or by addressing it to the teacher's last known address by registered or certified mail.

Appellant argues that the school district failed to substantially comply with the notice provision set forth in section 6–17–1507 and, therefore, did not allow her, "a reasonable teacher, the opportunity to prepare a defense," because Superintendent Cook did not specifically advise her of every section of the personnel policy and statute he thought she had violated. We disagree.

Arkansas Code Annotated section 16–17–201(a) (Repl.2007) provides that "[e]ach school district in the state shall have a set of written personnel policies, including the teacher salary schedule." Arkansas Code Annotated section 6–17–204(a) (Repl.2007) provides that the personnel policies in effect at the time a teacher's contract is entered into or renewed shall be considered to be incorporated as terms of the contract and shall be binding upon both parties. *See Stone v. Mayflower Sch. Dist.*, 319 Ark. 771, 894 S.W.2d 881 (1995). Traditional contract principles apply to teachers' employment contracts. *Barnett v. Mountain View Sch. Dist.*, 2010 Ark. App. 333, 374 S.W.3d 851. Although personnel policies do not have the force of law, as a matter of contract law and fair dealing, a teacher may reasonably expect the district to comply substantially with its own declared policies. *Helena–West Helena Sch. Dist. #2 v. Randall*, 32 Ark.App. 50, 796 S.W.2d 586 (1990).

It is true that Superintendent Cook stated that he orally advised appellant at the meeting in his office of most, but not all, of the rules he believed she had broken and that the written notice did not specifically list them. Nevertheless, the notice more than sufficiently complied with section 6–17–1507(c)(1)'s requirement that it "include a statement of the grounds for the recommendation of termination, setting forth the grounds in separately numbered paragraphs so that a reasonable teacher can prepare a defense." Superintendent Cook set forth the factual basis for each of the four grounds in such clear detail that any "reasonable teacher" would have no trouble preparing a defense. In fact, the defense that appellant offered at the school board hearing, and augmented at the hearing before the circuit court, left no doubt that she clearly understood all of the charges leveled at her, because she attempted to deny, explain, or rationalize every statement that the superintendent made in the notice. What actually happened at the hearing should also be considered in determining the sufficiency of notice to a teacher. *See Watson Chapel Sch. Dist. v. Russell*, 367 Ark. 443, 241 S.W.3d 242 (2006). Accordingly, we affirm on this point.

Appellant also argues that her termination was unlawful and without just and reasonable cause because the school

district had no written personnel policies specifically addressing the use of the bonus points. She asserts that the personnel policies and statutes on which Superintendent Cook relied did not apply to this situation and that the bonus points belonged to her because she had accrued a sufficient amount of them by spending her own money to order items. Again, we disagree.

Appellant's argument that the school district was required to include a written policy about such a minor topic as the bonus points in its personnel manual is not persuasive. It is not feasible to include a rule for every issue that might present itself during a teacher's term of employment. Appellee presented evidence that the other teachers understood that school policy prohibited the use of bonus points (which they could spend like real money with the book club) for the teachers' personal use. Also, the statutes were published. In any event, appellant was terminated for more than one reason; the superintendent also determined that she had argued with the principal when instructed about the bonus-points policy; used loud, intemperate language to the principal in the presence of others; was untruthful about what had happened; accused the principal of lying; and was rude, disrespectful, and argumentative in the meeting with him and the principal. Appellant ultimately admitted that she had used bad language when Ms. Preston first confronted her and that she had been sarcastic in the meeting with the superintendent. The school board found these reasons for termination were true, and the circuit court affirmed. Given our deference to the fact-finder on matters of credibility, we cannot say that the circuit court clearly erred in ruling that appellant's termination was for just and reasonable cause. Thus, we affirm on this point.

Appellant further argues that her termination was unlawful because the school board was "contradictorily advised" about its options by its counsel. She contends that the board's counsel may have confused the members of the board about their ability to modify the superintendent's recommendation that she be terminated. The school board's counsel's advice was as follows:

As you'll see there are three choices. You may accept the recommendation, which means Ms. Timpani is terminated effective immediately. You may reject the recommendation, which means that she is entitled to return to work tomorrow. Or you may modify the recommendation. Modification would be anything less than an immediate termination.

I'm not going to suggest what that might be, but I will tell you this, there's no such thing as probation. The School Board does not have the ability to place probation upon an employee.

If an employee commits an act which could justify dismissal and the School Board votes for some reason to place that employee on probation, if that employee commits the same or a similar act that could justify dismissal, you would have to start from the beginning, and we'd go through all of this all over again. So probation is not something that's available to you. But modification could be anything less than immediate termination.

We also see no error here. Appellee's counsel was correct in pointing out that "probation" is not specifically provided as an option in section 6–17–1510(b). He also made it clear that, if the school board did not wish to dismiss appellant, it could do something less than that, which would amount to a modification of the principal's recommendation. In any event, appellant

has demonstrated no prejudice, because there is nothing in the record to suggest that the board wanted to do anything less than dismiss appellant.

Affirmed.

PITTMAN and ABRAMSON, JJ., agree.